IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

AptarGroup, Inc.,                    )
                                     )
            Plaintiff,               )        Case No. 18 C 50328
                                     )
vs.                                  )
                                     )
Brenda Chamulak,                     )        Judge Philip G. Reinhard
                                     )
            Defendant.               )

## ORDER

For the reasons stated below, defendant's motion for judgment on the pleadings [36] is denied. The parties should proceed with discovery before the magistrate judge and are urged to consider settlement.

## STATEMENT-OPINION

Plaintiff, AptarGroup, Inc., brings this action against defendant, Brenda Chamulak, alleging breach of contract (Count I), misappropriation of a trade secret in violation of the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1831 et seq. (Count II) and misappropriation of a trade secret in violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1-9. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367(a).[1] Defendant moves for judgment on the pleadings [36] (Fed. R. Civ. P. 12(c)) and plaintiff moves for entry of a preliminary injunction [10].

The standard for ruling on a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is the same as that for ruling on a Rule 12(b)(6) motion to dismiss. Hayes v. City of Chicago, 670 F.3d 810, 813 (7th Cir. 2012). All well-pleaded facts are taken as true and all reasonable inferences are drawn in the plaintiff's favor. Regains v. City of Chicago, 918 F.3d 529, 533 (7th Cir. 2019).

The facts are taken from the allegations of plaintiff's complaint. Plaintiff is a developer and manufacturer of dispensing and sealing products used in the packaging of consumer goods.

---

[1] Jurisdiction is also alleged under 28 U.S.C. § 1332(a)(1) as plaintiff is a Delaware corporation with its principal place of business in Illinois, plaintiff is a citizen of Michigan, and the amount in controversy is alleged to exceed $75,000. However, defendant denies in her answer that the jurisdictional amount is met. Since federal question jurisdiction and supplemental jurisdiction exist, the court need not address at this time whether diversity jurisdiction also exits.

1

Among other products, plaintiff develops and manufactures dispensers and closures for use in the packaging of consumer goods. Defendant worked for plaintiff for 26 years. In June 2018, while serving as plaintiff's Vice President and General Manager, Personal Care and Home Care, North America, defendant voluntarily terminated her employment to take a position as the president and CEO of Jabil Packaging Solutions ("JPS") a division of Nypro, Inc. ("Nypro"). JPS and Nypro sell, among other products, dispensers and closures for use in the packaging of consumer goods.

On October 18, 1994, plaintiff and defendant executed an "Employee Confidentiality Agreement" ("Agreement").[2] The Agreement provides in relevant part:

"5. Except as instructed or authorized in writing by the Company's Chief Executive Officer, I will never directly or indirectly use, disseminate, disclose, lecture upon or publish any Confidential Information of the Company or any of its customers or clients, whether during or after my employment with the Company.

* * *

9. During the term of my employment with the Company and for an additional period of one year following termination of such employment, I will not directly or indirectly, for myself or any Conflicting Organization, sell or offer for sale, or assist in any way in the sale of, Conflicting Products to any customer or client of the Company, upon which I have called or which account I have supervised while an employee of the Company.

10. During the term of my employment with the Company and for an additional period of one year following termination of such employment, I will not directly or indirectly, engage in any Conflicting Organization or accept employment with or render services to any Conflicting Organization or take any action inconsistent with the fiduciary relationship of an employee to his employer, except that, following such termination, I may accept employment with a Conflicting Organization, the businesses of which are diversified, and which with respect to one or more of its businesses considered separately is not a Conflicting Organization, provided that the Company, prior to my accepting such employment, shall receive written assurance satisfactory to the Company from such Conflicting Organization and from me that I will not render services directly or indirectly in connection with any Conflicting Product or be employed in a position where I could use or disclose Confidential Information of the Company or of any of its customers or clients in connection with my employment responsibilities to the benefit of a Conflicting Organization."

---

[2] Plaintiff is referred to in the Agreement as "Company".

Paragraph 13 provides in relevant part:

"In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to time, duration, geographic scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the full extent compatible with the applicable law as it shall then appear."

The Agreement contains the following relevant definitions:

"'Confidential Information' of a person or organization means information disclosed to me or known by me as a consequence of or through my employment by the Company, including but not limited to information conceived, originated, discovered or developed by me, not generally known about the business operations, processes and products of such person or organization, including but not limited to information relating to research, Inventions, discoveries, technologies, improvements, plans, developments, techniques, formulae, processes, machines, methods of manufacture, compositions, drawings, models, layouts, projects, purchasing, accounting, financial affairs, engineering, apparatuses, assembly, quality control, laboratory analysis, testing, application, strategies, marketing, merchandising, selling, promotional materials, costs, prices, sales, customers, product development, trademarks and trade names, whether or not reduced to writing or graphic form.  Confidential Information shall not include any information which already has been published in a form generally available to the public.  Information shall not be deemed to have been published merely because individual portions of it have been separately published, but only if all the material features comprising such information have been published in combination."

"'Conflicting Product' means any product, technology or process of any person or organization other than the Company, in existence or under development, which is of the same type or intended for the same use as, or which competes or is potentially competitive with, a product, technology or process of the AptarGroup about which I have received Confidential Information."

"'Conflicting Organization' means any person or organization (including but not limited to any person or organization controlled by, controlling or under common control with such person or organization) who or which is engaged in, or is about to become engaged in, research or development, production, marketing or selling of a Conflicting Product."

Plaintiff alleges in Count I defendant breached the Agreement when she started working for JPS.  JPS is alleged to be a Conflicting Organization within the terms of the Agreement because it makes and sells products that compete with products of plaintiff about which defendant received Confidential Information during her employment with plaintiff.

In Count II, plaintiff alleges defendant misappropriated and will inevitably disclose plaintiff's trade secrets in violation of the DTSA.  Plaintiff alleges its trade secrets include "the technology, materials, and manufacturing methods used by [plaintiff], including its proprietary LIM silicone molding process, as well as its proprietary cost and pricing models that identify [plaintiff's] cost structure and calculations."  It alleges the circumstances of defendant's employment with plaintiff "gave rise to fiduciary duties to maintain the secrecy of, and not to misappropriate and misuse," its trade secrets; that by "accepting employment as president and CEO of JPS, [defendant] will inevitably misappropriate and misuse [plaintiff's] proprietary and confidential information, including [plaintiff's] trade secrets; and "[u]nder these circumstances, [defendant's] misuse of [plaintiff's] trade secrets can be inferred under the 'inevitable disclosure' doctrine."  The DTSA provides:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly–
>> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>> (4) attempts to commit any offense described in paragraphs (1) through (3); or
>> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C § 1832(a)[3]

The DTSA (18 U.S.C. § 1839) provides the following applicable definitions:

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–

>(A) the owner thereof has taken reasonable measures to keep such information secret; and
>
>(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

(5) the term "misappropriation" means–

>* * *
>
>(B) disclosure or use of a trade secret of another without express or implied consent by a person who–
>
>>* * *
>>
>>(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was–
>>
>>>* * *
>>>
>>>(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>>(III) derived from or through a person who owed a duty to the person seeking relief to maintain the

---

[3] While 18 U.S.C § 1832(a) is a criminal statute, 18 U.S.C. § 1836(b)(1) allows an "owner of a trade secret that is misappropriated" to bring a civil action "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

secrecy of the trade secret or limit
the use of the trade secret; or

(iii) before a material change of the position of the
person, knew or had reason to know that–

(I) the trade secret was a trade secret;
and
(II) knowledge of the trade secret
had been acquired by accident or
mistake;

(6) the term "improper means"–

(A) includes theft, bribery, misrepresentation, breach or
inducement of a breach of a duty to maintain secrecy, or espionage
through electronic or other means; and
(B) does not include reverse engineering, independent derivation,
or any other lawful means of acquisition;

Count III repeats the allegation that by "accepting employment as president and CEO of
JPS, [defendant] will inevitably misappropriate and misuse [plaintiff's] proprietary and
confidential information, including [plaintiff's] trade secrets and that "[u]nder these
circumstances, [defendant's] misuse of [plaintiff's] trade secrets can be inferred under the
'inevitable disclosure' doctrine".  It claims this is a violation of the ITSA.

The ITSA provides in 765 ILCS 1065/2:

(b) "Misappropriation" means:

(1) acquisition of a trade secret of a person by another person who knows or has
reason to know that the trade secret was acquired by improper means; or
(2) disclosure or use of a trade secret of a person without express or implied
consent by another person who:
(A) used improper means to acquire knowledge of the trade secret; or
(B) at the time of disclosure or use, knew or had reason to know that knowledge
of the trade secret was:
(I) derived from or through a person who utilized improper means to acquire it;
(II) acquired under circumstances giving rise to a duty to maintain its secrecy or
limit its use; or
(III) derived from or through a person who owed a duty to the person seeking
relief to maintain its secrecy or limit its use; or
(C) before a material change of position, knew or had reason to know that it was a
trade secret and that knowledge of it had been acquired by accident or mistake.

* * *

(d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

"The court analyzes the DTSA and ITSA together 'because the pertinent definitions of the two acts overlap.'" Abrasic 90 Inc. v. Weldcote Metals, Inc., 364 F. Supp.3d 888, 896 n. 3 (N.D. Ill. 2019) quoting, Molon Motor and Coil Corp. v. Nidec Motor Corp., 2017 WL 1954531 (N.D. Ill. May 11, 2017). To prevail on a trade secret misappropriation claim, plaintiff must show that the information at issue was a trade secret and that it was misappropriated. Inmar, Inc. v. Vargas, No. 18-cv-2306, 2018 WL 6716701, *3 (N.D. Ill. Dec. 21, 2018). "To establish a protectable trade secret under either statute, the party seeking protection must show that the information: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Id. (quotation marks and citation omitted). Factors that are significant in determining whether a trade secret exists are: "(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his or her competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id. (quotation marks and citation omitted). Whether certain information is a trade secret is ordinarily a question of fact to be resolved after the full presentation of evidence by the parties. Id.

Plaintiff has sufficiently alleged the misappropriation of a trade secret. Trade secrets need not be set out in detail in a complaint as "such a requirement would result in public disclosure of the purported trade secret." Covenant Aviation Security, LLC v. Berry, 15 F. Supp.3d 813, 818 (N.D. Ill. 2014) (quotation marks and citation omitted). The information and the efforts to maintain its confidentiality need only be described in general terms. Id. Plaintiff alleges its trade secrets include its technology, materials, and manufacturing methods, including its proprietary LIM silicone molding process, and its proprietary cost and pricing models that identify its cost structure and calculations. It alleges with some specificity the steps it takes to keep this information confidential including limiting the number of employees with access to the information, restricting to only certain employees access to areas of its computer systems housing the information and allowing only specified employees into the area where certain products are produced. Plaintiff requires non-employees (customers and suppliers) with a need

to review the information to agree to be bound to non-disclosure agreements. It alleges it derives economic value from maintaining the confidentiality of this information because the information is not known outside plaintiff, is not available through public sources and cannot be independently developed by its competitors. These allegations sufficiently allege the existence of a trade secret.

As to misappropriation, plaintiff alleges that "[b]y accepting employment as president and CEO of JPS, [defendant] will inevitably misappropriate and misuse [plaintiff's] proprietary and confidential information, including [plaintiff's] trade secrets" and, therefore, "[defendant's] misuse of [plaintiff's] trade secrets can be inferred under the 'inevitable disclosure' doctrine." "The 'inevitable disclosure doctrine' allows a plaintiff to prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets. In evaluating whether the facts justify this circumstantial-evidence inference, courts consider: (1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." <u>Molon Motor & Coil Corp. v. Nidec Motor Corp.</u>, No. 16 C 03545, 2017 WL 1954531, * 5 (N.D. Ill. May 11, 2017) (quotation marks and citations omitted).

The complaint alleges plaintiff and JPS/Nypro compete directly in the market for products used in the packaging of consumer goods, including closures. It alleges the customers of JPS/Nypro and plaintiff overlap substantially and that they compete directly in selling to these customers. These customers include Proctor & Gamble, Unilever, Kraft Heniz, Danone and Nestle.

The complaint alleges defendant's position with her new employer is a similar but more senior-level upper management position to the one she held with plaintiff. At plaintiff she was the Vice President and General Manager, Personal Care and Home Care, North America. Her position at JPS/Nypro is President and CEO of the JPS division of Nypro. Per the allegations in the complaint, defendant admitted that in her new position she would be overseeing Nypro's packaging business and that this business competed with plaintiff. In her position with plaintiff, she was responsible for plaintiff's Beauty & Home operations throughout North America. Plaintiff develops and manufactures packaging products for the consumer goods market. Exhibit B to the complaint is a screen shot from the JPS Linkedin page announcing defendant's joining JPS as president and CEO with a quotation from her that states: "We have the unique opportunity to create differentiated packaging solutions for some of the biggest brands in the world. I am so excited to connect Jabil's capabilities with the packaging market to create a powerful value proposition for our customers." The complaint sufficiently alleges defendant's new position overseeing JPS/Nypro's packaging business is comparable to her position overseeing plaintiff's North American Beauty & Home operations.

Plaintiff alleges that after defendant's departure from plaintiff it asked defendant and her new employer to explain what defendant's role with JPS would be and to provide written

assurances sufficient to establish defendant would not render services in connection with products that compete with plaintiff's products or be employed in a position where she could use or disclose plaintiff's confidential information. Defendant and her new employer have refused to do so. Taking these allegations most favorably to the plaintiff and considering the factors set out above, plaintiff has sufficiently alleged misappropriation under the "inevitable disclosure" doctrine for purposes of the motion for judgment on the pleadings. Plaintiff has sufficiently alleged the existence of a trade secret and its misappropriation. The motion for judgment on the pleadings as to Counts II and III is denied.

Turning to the Count I breach of contract claim, Illinois applies a "three-dimensional rule of reason" in assessing the reasonableness of employee agreements not to compete. Reliable Fire Equip. Co. v. Arredondo, 965 N.E.2d 393, 397 (Ill. 2011). Under this rule, "[a] restrictive covenant, assuming it is ancillary to a valid employment relationship is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." Id., at 396 (quotation marks and citation omitted).

> "[W]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case."

> Id., at 403.

"Each case must be determined on its own particular facts." Id. Reasonableness is gauged by all of the circumstances not just by some. Id. "The same identical contract and restraint may be reasonable under one set of circumstances, and unreasonable and invalid under another set of circumstances." Id. (quotation marks and citations omitted). Unless the non-competition provision is patently unreasonable, "the parties must be given a full opportunity to develop the necessary evidentiary record." American Transport Group, LLC v. Power, No. 17 C 7962, 2018 WL 1993204, * 4 (N.D. Ill. Apr. 27, 2018).

Defendant argues the Agreement is overbroad and, therefore, unenforceable. She contends the Agreement prohibits her from using the Confidential Information in perpetuity and that this lack of a durational limitation renders it unenforceable. She also maintains the definition of Confidential Information is overbroad because it draws within its definition all information known by her as a consequence of her employment with plaintiff.

However, the Agreement also expressly provides that if any provisions in the Agreement "shall for any reason be held to be excessively broad as to time, duration, geographic scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to

the full extent compatible with the applicable law as it shall then appear." While all of the information encompassed by the Confidential Information definition may not prove to be protectable, some of it (i.e. the information that also falls within the statutory definitions of trade secrets set out above) certainly appears to be. The determination of the limits of protectable information under the Agreement must come later in these proceedings.

Defendant also argues the non-competition provision is overbroad because it limits defendant from working for a competitor of plaintiff in any capacity, lacks a geographic restriction, and does not have any meaningful activity restriction. But these matters must all be considered in the factual context of the case to determine their reasonableness. Defendant is employed in a specific position at JPS which is alleged to be similar to the position she held with plaintiff. The Agreement provides a process for negotiating the scope of activity allowed at the new employer. The reasonableness of the assurances offered in this regard depends on the specific facts of this case. What assurances were offered? Were they reasonably sufficient to meet plaintiff's legitimate interests? What geographic scope is reasonable in light of where plaintiff and defendant's new employer compete? None of these questions can be answered on the pleadings. Defendant's motion for judgment on the pleadings on Count I is denied.

Plaintiff moves for a preliminary injunction. It seeks an injunction restraining and enjoining defendant from: "(1) being employed by JPS or Nypro, for a period of one year following entry of the injunction, in any capacity similar to the capacity in which she worked for Aptar or in any capacity in which she will disclose or use Aptar's Confidential Information and trade secrets, specifically her present position as president and CEO of JPS; and (2) using or disclosing Aptar's Confidential Information and trade secrets."

In her response to plaintiff's motion for preliminary injunction, defendant attaches as exhibits correspondence between defense counsel and plaintiff's counsel exchanged prior to the initiation of this litigation. In a letter date July 18, 2018 [23-6], defense counsel (Mr. Albritton) states: "Ms. Chamulak respects the principle that a company is entitled to protect its confidential information. Thus, Ms. Chamulak confirms her understanding that she is not to share any confidential Aptar information with Jabil or any other third party, and she similarly confirms that she has not and will not do so. Likewise, Jabil has made it a condition of her employment that she not disclose any confidential Aptar information." In a letter dated July 31, 2018 [23-8], defense counsel (Mr. Witz) states: "Further on behalf of both Jabil and Chamulak, we want to reiterate that Ms. Chamulak has no intention to share or use any of Aptar's confidential information, and she has not done so. Likewise, Jabil has no intention of allowing her to use or share such information and has required that she not do so as a condition of her employment. If you have any information to the contrary or to suggest any violation in this regard, please share it with us immediately, and we will address it." These representations by defendant suggest the possibility she may be open to the entry of an order enjoining her from doing what she has already agreed not to do – use or share any of plaintiff's confidential information.

It should go without saying that the court is not going to enjoin defendant from using every single bit of information "known by [her] as a consequence of or through [her]

employment" by plaintiff. Plaintiff ought to know what information of plaintiff's defendant might possess that is significant enough to warrant protection. Any injunction the court might issue must state its terms specifically and "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B),(C). Before the court can consider any injunction here, it will need a much more clearly defined description of what information specifically plaintiff wants to keep defendant from using and why that information warrants protection in order for the court to evaluate the appropriate content of an injunction should one issue.

As to defendant's current position at JPS, the court will need to evaluate evidence as to the duties of that position, the assurances offered by defendant and her new employer at the time she took the position and the actions the new employer has taken to prevent defendant from using or disclosing the information ultimately deemed by the court to be protectable. The parties should proceed with discovery before the magistrate judge and are urged to consider settlement.

For the foregoing reasons, defendant's motion for judgment on the pleadings [36] is denied.

Date: 6/10/2019

ENTER:

_Philip G. Reinhard_
United States District Court Judge

Electronic Notices. (LC)

11